UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURA LARKINS,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>DR. THOMAS MOORE, et al.,<br><br>　　　　　　　　　　Defendants. | Case No.: 16cv2661-LAB (NLS)<br><br>**ORDER DENYING LEAVE TO AMEND; AND**<br><br>**ORDER OF DISMISSAL** |

Plaintiff Maura Larkins, who is proceeding *pro se*, filed her complaint in this case, seeking declaratory relief only. When Defendants moved to dismiss, she filed an amended complaint. Defendants moved to dismiss that as well. After receiving briefing, the Court granted Defendants' motion in part. The amended complaint was dismissed as Defendants requested, but because it was not completely clear Larkins could not successfully amend, the Court dismissed without prejudice. If Larkins thought she could successfully amend, she was directed to file an *ex parte* motion for leave to amend, attaching her proposed second amended complaint as an exhibit.

Larkins filed a very terse *ex parte* motion, but the attached proposed amended complaint included lengthy legal arguments about the complaint's sufficiency. The Court summarily denied leave to amend, directing her to comply

1

with Civil Local Rule 15.1 – particularly Rule 15.1(b)(2)'s requirement that the proposed amended complaint be accompanied by a version that shows (through redlining or some other means) how the proposed amended pleading differs from the earlier version. Larkins' complaints are lengthy and the allegations are not organized chronologically; without some kind of guide to changes, the Court and opposing parties would be handed the onerous task of figuring out what changes she was proposing.

Larkins filed a renewed motion for leave to amend, which Defendants have opposed. She has attached her proposed second amended complaint (Docket no. 29-3 at 1–73, "Proposed SAC" or "Prop'd SAC") as well as a redline version as an exhibit, showing what changes she proposes to make. (Docket no. 29-22 at 1–73.) Because the Proposed SAC is so long, a redline version was a necessity. It allows the Court to see what she proposes to add or change, and to see if the proposed changes can salvage her claims. The motion is now fully briefed[1] and ready for disposition.

**Larkins' Claims**

Larkins claims she was retaliated against for making complaints. She also claims that Defendants tried to force her to give up her First Amendment rights, in exchange for being allowed to keep receiving health care. She characterizes the restrictions as a form of prior restraint.

Larkins is a former patient of the UC San Diego Health System ("UCSDHS"), which is part of the University of California system. Specifically, she was being provided with health care under the UCSDHS Concierge Physician Practice under

---

[1] Larkins filed her motion, and Defendants filed an opposition. As the proponent of the motion, Larkins was permitted but not required to file a reply brief. But instead of a reply brief addressing Defendants' arguments in their opposition, she refiled her opening brief.

a one-year agreement that began on October 7, 2013. By its own terms it would have expired a year later, on October 7, 2014. But because of difficulties in dealing with Larkins, Defendants cancelled it nearly a month early.[2] Dr. Lawrence Friedman wrote Larkins a letter dated September 11, 2014 explaining why he thought the doctor-patient relationship had broken down, and problems they were experiencing with her behavior. (Prop'd SAC, Ex. A.) She was given a hearing on October 6, 2014 to appeal her dismissal, and on October 27, 2014, Dr. Friedman offered to suspend her dismissal and permit her to continue her care at UCSDHS, subject to some conditions that were embodied in a Care Agreement she was asked to sign.

The Care Agreement's proposed restrictions on Larkins' conduct are as follows:

> 1. UCSDHS would assign her a Primary Care Provider ("PCP"), who would coordinate her care. Her PCP would refer her to other doctors and care providers.
>
> 2. Larkins could request a new PCP, but not more than once yearly. The PCP assigned to her would be at UCSDHS's discretion.
>
> 3. Larkins could contact her PCP through scheduled clinic visits, or via an online messaging system called MyChart. The messages sent through MyChart would be part of her permanent medical record.
>
> 4. MyChart was not monitored at all times; messages sent through MyChart might not be read immediately, and might remain unread for up to three days.
>
> 5. If Larkins needed to contact someone more immediately, she could

---

[2] "You or UCSD may terminate this Agreement for any reason and at any time, at will, with or without cause, with or without giving any reasons by giving written notice to the other party." (Docket no. 14 (Larkins' Opposition to Defendants' Motion to Dismiss), Ex. P at 3.) The September 11 letter quoted this provision. (Prop'd SAC, Ex. A.)

schedule an urgent clinic visit, or if she wished, visit an Emergency Department.

6. Larkins could send her PCP no more than one PCP message per week, and the messages could not be longer than thirty words. If she wanted to discuss a more complex issue, she could request an appointment to speak with her PCP or someone designated by the PCP.

7. The PCP would determine the medical need, urgency, and appropriateness of an office visit.

8. Larkins' PCP was not required to manage or respond to messages personally, but could rely on an associate to do that.

9. Larkins was not to send emails to UCSDHS doctors.

10. Larkins was required to acknowledge that her doctors might need to talk with pharmacists about her treatment.

11. Larkins would not be eligible for participation in any UCSDHS Concierge Medicine programs.[3]

12. A report of her care plan and a copy of the Care Agreement would be sent to specialists when referrals were made.

(Prop'd SAC, Ex. B.) The Care Agreement included a preface explaining UCSDHS's reasoning in imposing the restrictions. It explained that accusatory emails and MyChart messages, particularly those not related to her own care at UCSDHS, were causing disruptions and preventing doctors from being able to attend to their other patients. (*Id.*) It included joint provisions, essentially acknowledging that the doctors were making medical judgments and were not

///

---

[3] This restriction is a moot point, because Larkins makes clear she did not and does not want Concierge Care.

4

required to provide treatments Larkins thought she needed. (*Id.*) And it included UCSDHS's promise to listen to her concerns and treat her with respect. (*Id.*)

Larkins refused to sign the Care Agreement, because she says it improperly restricts her rights. On November 17, 2014, Dr. Thomas Moore sent Larkins a letter denying her appeal requesting continued care at UCSDHS.

Larkins believes all this was done in retaliation for her having filed a HIPAA complaint, and also because she made various complaints, including complaints about the quality of the health care she was being provided, and the incompleteness of medical records. Larkins' claim focuses on the conditions for reinstatement that would have restricted her communications or meetings/appointments. She does not challenge other terms mentioned in the offer. She also does not argue that the offer would not have been honored, if she had agreed to it and complied with its terms.

She inexplicably also says she voluntarily left Concierge Care and does not want to go back to it because it is too expensive. (Prop'd SAC, ¶¶ 110–12, 160.) While she has a lot of complaints about lack of access to doctors that she says she was promised if she signed up for Concierge Care (*see, e.g., id.*, ¶¶ 96–97), she has disclaimed damages. She suggests that she wants to be treated by a UCSDHS physician under some other arrangement. But she has never developed any claim that she is entitled to such an arrangement, or even if she were, what its terms would be.[4]

Defendants' position is that she was inappropriately badgering physicians, making disruptive unfounded accusations, demanding excessive time and

---

[4] The pleadings imply that other arrangements are or have been available, which provide levels of care other than Concierge. But Larkins' claims focus on the agreement she was a party to until late 2014, not other arrangements she never signed up for. Larkins does not allege that the limitations under another arrangement would have been any different than those under the Care Agreement.

attention, and wasting medical resources (*see* Prop'd SAC, Ex. A (giving details)), and the limitations were intended to curtail those problems.

**Legal Standards**

"Although leave to amend should be given freely, a district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011) (citation omitted). Similarly, leave to amend need not be granted where the proposed amended complaint would be subject to dismissal. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998).

As was the case with her first amended complaint, the Proposed SAC seeks injunctive relief essentially requiring Defendants to provide her with health care free from restrictions she disagrees with. She also seeks declaratory relief that would amount to a statement from the Court that Defendants violated her rights and that she is entitled to health care without the limitations they want to impose. She is not seeking damages.

Because the Proposed SAC is similar in many ways to the first amended complaint, much of the Court's reasoning in its earlier order dismissing the first amended complaint (Docket no. 23) applies here as well. *See Larkins v. Moore*, 2017 WL 4012334, slip op. (S.D. Cal., Sept. 11, 2017). The Court does not repeat its full analysis here, but incorporates that reasoning into this order. While the Court is aware that it has discretion to reconsider those earlier rulings, *see United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004), the law of the case doctrine means it will not lightly do so. *See Arizona v. California*, 460 U.S. 605, 618–19 (1983) (discussing law of the case doctrine).

The Court construes pro se pleadings in civil rights cases liberally, *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir.1987), but will not supply facts a plaintiff has not pleaded. *See Ivey v. Board of Regents of the Univ. of Alaska*, 673 F.2d 266, 268

(9th Cir.1982). The pleading standard is governed by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). This standard doesn't allow a plaintiff to plead mere "labels and conclusions;" rather, she must allege facts sufficient to raise her "right to relief above the speculative level." *Twombly* at 555. The pleaded facts must show her claim is plausible, not merely possible. *Iqbal* at 678. For purposes of the pleading standard facts do not include "legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994). Nor do they include "conclusory allegations of law and unwarranted inferences . . . ." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998).

**The Proposed Second Amended Complaint**

Larkins is bringing claims under 42 U.S.C. § 1983 for alleged deprivations of her First Amendment rights of freedom of speech and freedom to petition for redress of grievances. She characterizes her free speech claim as based on both retaliation and prior restraint, and her theories of recovery fall into these two categories. Although she has augmented her allegations, the claims are essentially the same as the claims the Court dismissed earlier.

The Court has already ruled that the Care Agreement Defendants asked Larkins to sign did not give rise to a First Amendment violation, regardless of whether Larkins' claims were based on restriction of free speech rights, restriction of petition rights, or a retaliation theory. 2017 WL 4012334 at *4. One way to cure the complaint's defects might have been to allege additional facts (if there were any to allege) showing that Defendants took other steps to retaliate against her, or imposed some other kind of restrictions.

But the Proposed SAC does not add any factual allegations that would cure the defects. Even though it is almost three times as long as the first amended complaint, it does not include much more relevant factual detail. It can fairly be

described as replete with vehement conclusions but short on facts to support them. Simply adding more descriptive words and explanations, expressing great conviction, or including tangential details is not enough to salvage pleadings that fall short of the *Twombly* and *Iqbal* standard. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") *See also Ayala v. Cty. of Imperial*, 2017 WL 469016, at *6–7 (S.D. Cal., Feb. 3, 2017) (citing cases for the proposition that even very lengthy and impassioned allegations may fail to satisfy the pleading standard).

Leave to amend is being denied for these reasons. In addition, the Court adds the following reasoning.

**Public Concern**

Larkins also contends that by complaining about Defendants' alleged malfeasance she is speaking about matters of public concern, and is therefore entitled to a higher degree of protection. *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–61 (1984). Whether speech is a matter of public concern is judged by the content, form, and context of the speech. *Connick v. Myers*, 461 U.S. 138, 147–48 (1983).

Although Larkins makes a number of allegations regarding Defendants' general policies, and their involvement in some kind of conspiracy and cover-up, these fall far short of the *Twombly* and *Iqbal* standard. The non-conclusory factual allegations pertain only to Larkins' discussions with Defendants about her own treatment, and other matters specific to her. It is troubling when hospital administrators and doctors do not carry out their jobs properly. And it would be worrisome if Larkins' assertions about how they interacted with and treated her are true. Other patients or members of the public might find this information enlightening or interesting on some level. But that does not transform what is essentially a private grievance into a matter of legitimate public concern for First

Amendment purposes. *See Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (citing cases); *Brownfield v. City of Yakima*, 612 F.3d 1140, 1149 (9th Cir. 2010) (public employee's complaints about co-workers and supervisors were not a matter of public concern).

Furthermore, Larkins never directed her speech to the general public, and the circumstances suggested she was interested in resolving her own disputes only. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 866 (9th Cir. 1999) (noting that that a plaintiff's motivation and the audience the speech is directed to are relevant to the public-concern inquiry). This further supports the conclusion that her speech concerned a private matter, rather than matters of general public interest.

**Restraint on Speech and Petition Rights**

The First Amendment protects the right to petition the government for redress of grievances, as well as freedom of speech. It does not, however, require government officials or employees to listen or respond to communications, even those on matters of public concern. "Nothing in the First Amendment or in [the Supreme Court's] case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Minn. State Bd. for Comm. Colls. V.* Knight, 465 U.S. 271, 285 (1984). *See also Smith v. Ark. State Highway Employees, Local* 1315, 441 U.S. 463, 465 (1979). Reasonable restrictions on time, place, or manner can be permitted, to further a substantial government interest. *See Clark v. Comm. for Creative Non-Violence*, 468 U.S. 288, 298 (1984) (reiterating that "reasonable time, place, or manner restrictions on expression are constitutionally acceptable"); *Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Berch*, 773 F.3d 1037, 1047 (9th Cir. 2014). The nature of the forum and the pattern of its normal activities determine whether regulations are reasonable. *United States v. Christopher*, 700 F.2d 1253, 1259 (9th Cir. 1983).

In the past, Larkins communicated frequently with various doctors and medical staff, to an extent Defendants apparently decided was bothersome or burdensome. (*See* Prop'd SAC, Ex. A (describing Larkins' interactions with doctors).) Larkins believes they were unreasonable in objecting to the amount and nature of communications, but she agrees they were unhappy about it. Larkins asserts, and the Court agrees, that the proposed Care Agreement contained limitations that were intended to cut down on the amount of communication she was sending, and on the number of recipients. She also appears to believe that the First Amendment guarantees her unlimited and unrestricted communication with doctors and medical staff, but in this she is wrong.

Even outside the medical context, government agencies generally do not have enough resources to listen to everything members of the public might want to say. *See Knight*, 465 U.S. at 285 ("It is inherent in a republican form of government that direct public participation in government policymaking is limited.") But in the medical context, this is especially true. The time and attention that doctors and medical staff have available to communicate with patients is a health care resource that is not only finite, but scarce. *See Stephenson v. Shalala*, 87 F.3d 350, 356 (9th Cir. 1996) (describing health care resources as "scarce and precious"). Neither Larkins nor anyone else has a constitutional right to as much of doctors' time as she might want, and permitting one person to take too much leaves too little for others. Of necessity, health care providers must — and do — put some limits on the amount of patient communication they can consider, and on how and when patients can contact them. Hospitals and other health care facilities generally limit which doctors patients consult with, for how long, and through what channels, so such restrictions are likely to be reasonable. *See Christopher*, 700 F.2d at 1259. Here, they were.

It bears mention that the proposed restrictions do not forbid Larkins from expressing herself as a general matter. The restrictions have nothing to say about

communications other than those directed to the medical staff. They are also directed only at certain types of communication: emails, MyChart messages, and real-time conversations.

Larkins' right to petition also does not include the right to choose which doctors or administrators to submit her complaints to. The right to petition is a right to petition the government, not to choose which officers or employees (if any) will listen to her grievances. *Knight*, 465 U.S. at 282 (rejecting argument that appellants had a "right to force officers of the state acting in an official policymaking capacity to listen to them in a particular formal setting").

Larkins also implies that she has a right to submit all her grievances in writing, so as to create a "paper trail." (Prop'd SAC, ¶¶ 99, 102–03.) She concedes that there are no restrictions on what she can say orally. (Prop'd SAC, ¶¶ 99 ("Defendants are ready to allow Plaintiff to say anything she wants orally."), 101 ("The Care Agreement would not limit Plaintiff's oral speech with her health care providers in person at an office visit or by phone.")) She also does not explain why sending letters through the mail would not suffice. But in any event, the right to petition does not include the right to be heard in a particular manner or setting. *Knight*, 465 U.S. at 282. Even with the restrictions Defendants proposed, Larkins would have been able to air her grievances, albeit not in the manner she would have liked. *See Smith v. City of San Diego*, 447 Fed. Appx. 770 (9th Cir. 2011) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 131 n.6 (1977)) (the restriction of some avenues for petitioning the government does not violate the First Amendment).

**Retaliation**

The government may not retaliate against a person for exercising her freedom of speech, because doing so can inhibit the exercise of that freedom. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). A First Amendment retaliation claim requires allegations that a government officer took action to deter or chill the

plaintiff's exercise of her rights, and that the officer's desire to chill her speech was a but-for cause of the chilling conduct. *Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013). The proper inquiry is not whether the plaintiff's First Amendment activities were actually chilled, but rather whether they would "chill a person of ordinary firmness." *See Lacey v. Maricopa County*, 693 F.3d 896, 916–17 (9th Cir. 2012) (en banc).

Larkins alleges that Defendants retaliated against her for filing a HIPAA complaint. The basis for the complaint she submitted was an electronic notification on May 28, 2014 telling her she had agreed to have the UCSDHS share all of her unrestricted health information with outside health care staff who were providing Larkins with medical treatment, and with public health authorities.[5] (Prop'd SAC, Ex. P.) Then she notified her doctor, who said she had accidentally been signed up. (*Id.*, Ex. Q.) In various places, she has also suggested that Defendants may be retaliating against her for other complaints she made.

Larkins alleges that dismissing her, denying her health care, trying to impose the Care Agreement on her, and refusing to reinstate her without requiring her to sign the Care Agreement all amounted to retaliation.

The initial dismissal letter and suspension of health care did not amount to retaliation, in part because Defendants had a contractual right to terminate the agreement at any time. Furthermore, Larkins says she had already terminated it, and that the dismissal letter only amounted to Defendants' pretending it was their idea to dismiss her instead of vice versa. By terminating the agreement herself,

---

[5] It's not clear any protected health information was ever disclosed, or that if it was, there was a HIPAA violation. Sharing a patient's protected health information with other health care staff for purposes of providing treatment to the patient is permitted by HIPAA, even without authorization. 45 C.F.R. 164.506(c)(4). Similarly, protected health information can be shared with public health authorities for various purposes without authorization. 45 C.F.R. 164.512(b)(1).

Larkins gave up any reasonable expectation that she would continue to receive health care under that agreement.

Even assuming Larkins could get past these obstacles, Defendants offered to withdraw the dismissal decision. This converted it from an actual adverse action into the mere threat of one. *See Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) (holding that retaliation claim requires an actual sanction; "[m]ere threats and harsh words are insufficient").

The Care Agreement, while allegedly atypical for patients at UCSDHS, included the type of limitations that patients routinely accept even without a formal agreement, in situations where there is clearly no coercive or punitive intent. For example, many patients have primary care providers who serve as a clearinghouse for their medical care, referring them to specialists when in the doctor's judgment it is necessary. Doctors, or their assistants, commonly communicate with pharmacists about patients' medications. Doctors' offices typically have business hours, and problems outside those hours are treated in urgent care or emergency rooms. Doctors typically do not answer phone calls in their own offices, but delegate that task to others. These and the other limitations, both individually and as a whole, might not be optimal from all patients' point of view. But by the same token, they are commonly accepted as both necessary and benign.

Furthermore, these restrictions were not calculated to deter Larkins from either speaking freely or petitioning. They left her free to do these things, and merely limited the avenues for her to do those things at UCSDHS. They had no effect on what she said either at UCSDHS or elsewhere, or whether she petitioned for redress. And they would not have penalized her in any other significant way. If Defendants had actually wanted to chill Larkins' exercise of her rights, this would have been a very ineffective way to go about it. Finally, the final dismissal of Larkins was because she would not accede to the Care Agreement and she does not claim otherwise.

Requiring a patient to sign an agreement that contains the type of restrictions the Care Agreement does would not chill a person of ordinary firmness. Most patients do not have unfettered access to doctors and do not expect it, so being told they cannot have it would hardly be a threat at all. An ordinary person would either agree to the restrictions, or if they were unsatisfactory, look for medical care elsewhere. San Diego is a big city with many other options.

Finally, the plausibility of Larkins' claim that her dismissal amounted to retaliation is undermined still further by her insistence that she voluntarily withdrew from Concierge Care, and that Defendants were trying to pretend it was their choice to dismiss her, rather than her choice to leave. (Prop'd SAC, ¶¶ 110–12, 160.) This is not an accident or mistake. The incongruity of this has been pointed out to Larkins before (*see* Order Granting in Part Motion to Dismiss, Docket no. 23, at 1:27–28, 5:12–21, 9:22–24), and she persists in her assertions. Accepting her allegations as true, she had already exercised her own right to terminate the agreement before Dr. Moore sent the letter dismissing her. And she makes clear she had no desire to rejoin Concierge Care. This saps her "dismissal" of any chilling effect it might otherwise have had.

**Relief Sought**

As Defendants point out, the Court cannot grant the relief Larkins is asking for. Most of it is not directly related to Larkins' First Amendment claims in this case and instead seems to arise from other grievances she has or expects to have. Nor would it offer her any meaningful relief even if it were granted. The injunction she requests would be unenforceable and essentially meaningless.

The agreement Larkins seeks to enforce has already expired, and she does not want to renew it or pay for services under it. Instead, she seems to be asking for a higher level of service with no significant limitations on her access to doctors. She has made clear she wants to pay less for it than she did for Concierge Care. There does not appear to be any likelihood that such an arrangement is feasible.

*See Larkins*, 2017 WL 4012334, slip op. at *4 (noting that Larkins has no doctor-patient relationship with any doctor in the UCSDHS system, and that Larkins did not suggest any of them would be willing to take her as a patient, particularly if she would not sign the Care Agreement). Nor can the Court effectively compel doctors to accept Larkins as their patient, particularly if they are uneasy with her.

The declaratory judgment Larkins requests is unavailable for essentially the same reasons.

**Other Arguments and Claims**

Larkins raises a variety of other arguments and claims, but they are either contradicted by the documents she cites, or are not supported by law.

**Conclusion and Order**

For the reasons set forth in earlier orders and in this order, Larkins' Proposed SAC does not cure the defects already pointed out to her. If it were filed, it would be subject to dismissal. Her motion for leave to file a second amended complaint is **DENIED**. Because it is clear that Larkins cannot salvage her complaint by further amendment, this action is **DISMISSED WITH PREJUDICE**. The Clerk is directed to enter judgment for Defendants.

**IT IS SO ORDERED**.

Dated: September 17, 2018

Hon. Larry Alan Burns
United States District Judge